SECOND DIVISION

No. 1-05-3526

| | |
|---|---|
| ANDREW JONES, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Cook County. |
| | ) |
| v. | ) |
| | ) |
| DHR CAMBRIDGE HOMES, INC., | ) |
| | ) No. 00 L 06717 |
| Defendant-Appellant and | ) |
| Third-Party Plaintiff- | ) |
| Appellant | ) |
| | ) |
| | ) Honorable |
| | ) Ralph Reyna, |
| (Residential Carpentry, Inc., | ) Judge Presiding. |
| | ) |
| Third-Party Defendant- | ) |
| Appellee). | ) |

JUSTICE HALL delivered the opinion of the court:

The plaintiff, Andrew Jones, filed a complaint against the defendant, DHR Cambridge Homes, Inc. (Cambridge), seeking damages for personal injuries he sustained while working on a construction site. Cambridge filed a third-party complaint against the plaintiff's employer, Residential Carpentry, Inc. (RCI), seeking contribution pursuant to the Joint Tortfeasor Contribution Act (740 ILCS 100/1 et seq. (2000)). Prior to sending the case to the jury, the trial court granted RCI's motion for a directed verdict on Cambridge's contribution claim. The jury returned a verdict in favor of the plaintiff.

Cambridge appeals raising the following issues: (1) whether the trial court erred in granting RCI's motion for a directed verdict; (2) whether the trial court erred in failing to include

No. 1-05-3526

RCI on the verdict form apportioning damages; (3) whether the trial court erred in failing to include a nonparty on the jury verdict form; (4) whether the trial court erred in barring the use of a surveillance videotape of the plaintiff; (5) whether the trial court erred in barring any testimony that OSHA had failed to issue any citations for walking on sill plates; (6) whether the plaintiff's counsel's remarks during closing argument required a new trial; and (7) whether the trial court erred in refusing to give Cambridge's nonpattern jury instructions. The pertinent evidence is summarized below.

For the Plaintiff

The plaintiff was employed as a carpenter by RCI. Cambridge, the owner and general contractor, subcontracted with RCI to perform the carpentry work on the Cambridge Walk subdivision it was constructing. The plaintiff described the process of erecting first floor joists. The sill plates were affixed to the steel beams set in place and braced by the ironworkers. Sometimes the carpenters have to move the steel slightly and rebrace it. There were several houses in the subdivision on which the plaintiff had to restraighten the bracing before the sill plates could be placed. The plaintiff reported the problem to Mr. Zembruzski, the RCI foreman, but the problem did not get resolved.

On November 4, 1999, the plaintiff walked out on a wooden sill plate that was mounted on a structural steel beam to take

2

measurements for the layout of the floor joists. The sill plate was approximately eight to nine feet off the ground and was wider than the steel beam. The "brace," which the plaintiff had secured the day before, ran perpendicular to the sill plate on which the plaintiff stood and spanned the distance between that sill plate and an adjacent sill plate and beam. In performing his measurement, the plaintiff placed his left foot upon the brace and leaned forward to obtain a measurement. The brace flipped up causing the plaintiff to fall forward into the basement area.

According to the plaintiff, he was never told he could not walk out on a sill plate on a steel beam. While he was trained not to walk on a brace, he was never told he could not place the weight of his foot on the brace. It was not unusual to put a foot on a brace.

The subcontract agreement between Cambridge and RCI provided in pertinent part as follows:

> "Safety Precautions and Procedures - The Subcontractor shall take all reasonable safety precautions with respect to the Work and shall comply with all safety measures required by Contractor and by all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including but not limited to the provisions of the Occupational Safety and Health Act,[1]

[1]Hereinafter referred to as "OSHA."

as amended from time to time and all regulations relating thereto."

And

"Temporary Facilities and Services - Subcontractor shall furnish all temporary offices, sheds and tool houses, equipment, power, water, temporary lights, hoistings, scaffolding, ladders, deckings, stagings, runways, and all other facilities required in connection with the Work."

The subcontract agreement also provided that "the latest edition of the General Conditions of the Contract for Construction, AIA Document A-201" was also made part of the subcontract agreement.

Mark Tuma was the construction superintendent for Cambridge on the project. Cambridge scheduled and sequenced the work of the various trades on the project. It would also inspect the work of the trades for compliance with the subcontracts, which included compliance with Cambridge's safety manual. It was part of Mr. Tuma's job to make sure that the trades adhered to the safety manual. Cambridge held weekly meetings to discuss the progress of the work and to address problems, including safety issues. He would inform a trade to fix a problem. Each trade had to provide a safety manual.

Mr. Tuma acknowledged that the subcontract agreement identified Cambridge as the "contractor," that RCI was a subcontractor and that the AIA Document A-120 general conditions were made part of the subcontractor agreement. Mr. Tuma was then

4

No. 1-05-3526

questioned by the plaintiff's counsel about specific provisions of the general conditions as follows:

"Q.  Section 3.3 of these general conditions are entitled 'supervision and construction procedures;' do you see that?

A.  Yes.

Q.  And 3.3.1 reads as follows - - tell me if I've read correctly.

'The contractor shall supervise and direct the work using the contractor's best skill and attention.  The contractor shall be' keyword here 'solely' - - do you see that?

A.  Yes.

Q.  'Solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for having coordination - - and for coordinating all portions of the work under the contract unless the contract documents give other specific instructions concerning these matters.'  Do you see that?  So far I am reading it right?

A.  Yes.

Q.  It goes on to read, 'if the contract documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the contractor shall evaluate the job site safety thereof and as except

5

No. 1-05-3526

stated below, shall be fully and solely responsible for the job site safety of such means, methods, techniques, sequences or procedures."

Mr. Tuma agreed that was what the general conditions provided.

Mr. Tuma was then questioned about article 10 of the general conditions as follows:

"I'm referring you to specifically to article ten which is entitled 'protection of persons and property;' do you see that?

A. Yes.

Q. 10.1, 'safety precaution and programs;' do you see that?

A. Yes.

Q. 10.1.1, reads as follows - - tell me if I'm not reading it correctly, please.

'The contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the contract.' Do you see that?

A. Yes.

Q. And if you go down to 10.2.1, safety of persons and property, it reads:

'The contractor shall take reasonable precautions for the safety of and shall provide reasonable protection to prevent damage, injury, or loss to .1, employees on the

6

No. 1-05-3526

work,' correct?

A. Yes."[2]

According to Mr. Tuma, if he observed an OSHA violation or an unsafe practice on a construction site, he could stop it. OSHA required that residential construction workers have some type of fall protection if they were exposed to a six-foot or greater fall. A "controlled access zone" (CAZ) was used to control the environment for particular work. Other than "awareness," no other fall protection was in place, even though Mr. Tuma was aware that the RCI carpenters were working nine feet in the air on the sill plates. Mr. Tuma did not think this was dangerous; it was a common practice and utilizing a CAZ complied with OSHA. While there were safer alternatives to walking the sills, he chose not to instruct the trades on how to perform their jobs. He did recall that someone from RCI brought the problems with the steel to his attention. Mr. Tuma had no problems with RCI on the project.

At the time of the plaintiff's accident, Randall Jensen was employed by RCI and was the safety coordinator for the project. He described the plaintiff as a very qualified carpenter and not known to take any unnecessary risks. While working on the project, he observed Cambridge supervisors, Mr. Tuma and Mark

_____

[2]The AIA Document A-201 general conditions were contained in the plaintiff's trial exhibit No. 2. However, the exhibit was not made a part of the record on appeal.

7

Gagliano inspecting the work on the site. If the supervisors requested that a trade correct a problem, the trade would do so. Only Cambridge had authority to change specifications. No safety issue was ever raised about working off the sill plates. If Cambridge had directed RCI to stop the practice, it would have done so. While it was safer to use a ladder, the job then took longer. Neither Cambridge nor RCI told the carpenters they could not use ladders. Cambridge's weekly safety meetings were attended by RCI's foremen, who would then meet with RCI employees, because it was RCI's job to educate its employees, not Cambridge's.

Richard Lamb was a regional director for Cambridge. At the time of the plaintiff's accident, he was overseeing 14 projects including the Cambridge Walk project. Mark Tuma and Mark Gagliano worked under him as superintendents. Part of the superintendents' job was to enforce Cambridge's safety manual. Cambridge's safety regulations applied to all the subcontractors on the site. If a superintendent observed a safety violation, it was his responsibility to see that it was corrected. At the time of the plaintiff's accident, the superintendents were trained to enforce the OHSA six-foot fall protection rule. While there were no exceptions to the fall protection rule, there were alternative fall protection means, such as creating a CAZ. Mr. Lamb acknowledged that a CAZ did not protect against injuries sustained in falls.

Mr. Lamb acknowledged that Cambridge did not tell its subcontractors how to do their jobs. Safety barriers, railings and the like were the responsibility of the carpentry contractor. Cambridge's duties were to coordinate the project and make sure that the job was done according to the specifications and that the contractors were in the right place. He never told a carpentry contractor that the employees should not walk on a sill plate. He understood that activity was permitted by OSHA.

At the time of the plaintiff's accident, Jerome Coleman was employed by RCI as a superintendent at the Cambridge Walk project. He was the highest-ranking RCI employee on the site. By entering into a subcontract with Cambridge, RCI was required to conform to Cambridge's safety program and to follow its rules with regard to safety. Cambridge could and did dictate safety rules with regard to RCI's work. Mr. Tuma could stop RCI's work if he thought the employee was doing something unsafe. If Cambridge thought that RCI was not doing its work safely, it could remove RCI from the job. Mr. Coleman reviewed the accident report, which noted that the plaintiff had one foot on the brace and which was considered okay. Mr. Coleman did not have a criticism of the plaintiff's actions. Mr. Coleman had taken OSHA classes and attended safety meetings where the OSHA regulations were reviewed. To his knowledge, OSHA did not prohibit walking on sill plates.

According to Mr. Coleman, RCI supplied all of its own

9

equipment in connection with its work for Cambridge. RCI required all its employees to attend its weekly safety meetings. He was unaware of anyone from Cambridge instructing the plaintiff to walk on the sill plates. All of the means and methods of doing the work were the responsibility of RCI, not Cambridge. RCI did not permit new carpenters on heights or dangerous areas initially. If the plaintiff had stepped on a brace that was unsecured or possibly unsecured, he was not following the safety rules.

Phillip Colleran was a self-employed safety and health consultant, specializing in construction safety. He had worked for OSHA for 17 years and rose to become a senior compliance officer. While working for OSHA, he received training and took courses and seminars on workplace safety. He provides teaching for OHSA and does work for the agency on small projects. He has also written articles on residential construction site safety, including one on fall protection.

Mr. Colleran explained that, as of 1995, OSHA required that residential construction employers provide fall protection for any operation requiring work six feet or higher above the ground. There was a presumption that it was feasible and would not create a greater hazzard to implement fall protection systems, such as guardrails, personal fall arrest systems, nets or other types of systems that provide a measure of protection against falls, such as ladders or scaffolds. The employer had the burden of

10

No. 1-05-3526

establishing that it was appropriate to implement a fall protection plan which complied with OSHA's regulations in lieu of implementing one of those systems. Both Cambridge and RCI were subject to OSHA.

According to Mr. Colleran, under OSHA's regulation, the plaintiff should have been provided fall protection, suited to the job at hand, which, in this case, would have been ladders or sawhorses with planks. The regulations also required inspections. In terms of who was to carry out the inspections, Mr. Colleran stated as follows:

"I'm talking about RCI, obviously, but I'm also talk [sic] about Cambridge who knew full well that this activity was going on and said it's a matter of money as to why it wasn't abated or that it was basically something that was commonplace and accepted at that. And they were in a position certainly with their pursestrings authority to have intervened and said, RCI, you're imperiling people up here by allowing them to walk these beams. You've got to basically stop this, just as they have in their contract. You have to abide by OSHA."

Mr. Colleran agreed that after the plaintiff, the best line of protection for the plaintiff was his employer.

Michael Zembruzski was a foreman for RCI at the time of the plaintiff's accident. At the time of trial, he was employed by Cambridge as a superintendent and had the same duties as Mr. Tuma

11

at the time of the plaintiff's accident. These duties included stopping a subcontractor's work if it was not working in accordance with Cambridge's safety program. Prior to sending RCI to work on a lot, Mr. Tuma would have been expected to make sure that the lot was ready and safe for RCI, i.e., that the steel was properly erected. After the plaintiff complained to Mr. Zembruzski about the setting of the steel, Mr. Zembruzski took the matter up with Mr. Tuma and understood that the problems were going to be fixed.

Mr. Zembruzski explained that the carpenters laying out the sill plates had no fall protection, other than the CAZ, which only warned of a fall hazzard. Neither RCI nor Cambridge provided the plaintiff with training regarding walking on the sill plates. Walking on a sill plate would not have been a violation of RCI's policies at the time of the accident. The work could have been done from a ladder, but would have been a bit slower. If Mr. Tuma had considered walking on the sill plate to be unsafe, he had the authority to stop the work. Cambridge did not tell RCI how to do its work.

### For Cambridge

Mark Gagliano was employed by Cambridge and was responsible for the preparation of the contract between Cambridge and RCI. Although the contract specified such things as the quality of wood to be used in construction, it did not provide instructions to the subcontractors as to how to do their work. The contract

12

required RCI to perform its work in compliance with federal, state and local laws and the minimum statutory health and safety requirements. Each trade was responsible for providing its own safety equipment. Cambridge did not supply any scaffolding or ladders or equipment of any sort. If needed, they would be supplied by RCI in this case.

Mr. Gagliano explained that the AIA Document A-201 was not physically included in the contract. It was designed to provide general conditions between the owner and the general contractor. In this case, Cambridge was both the owner and the general contractor. An ambiguity was created because RCI was referred to as the subcontractor. However, the intention was to bind RCI and Cambridge to these general conditions. While he maintained that Cambridge did not really dictate the means and methods of doing the subcontractors' work, Mr. Gagliano agreed sections 3.3.1 and 10.1.1 of the general conditions provided that Cambridge, as the contractor, was solely responsible for and had control over the means and methods of the work and was responsible for safety in connection with the work. If Cambridge had not wished to undertake these obligations, it could have chosen not to incorporate them into the contract with RCI.

Eugene Holland was Cambridge's expert witness on construction safety. His work in construction safety predated OSHA. He had taken the 10-hour OSHA course, belonged to the American Society of Safety Engineers and taught courses at the

13

No. 1-05-3526

University of Illinois, at Chicago, having to do with materials used in construction. OSHA rules were included in those courses. He had provided consulting services to OSHA on a nonpaid basis. He was familiar with the OSHA regulations pertaining to fall protection.

According to Mr. Holland, it was a custom and practice in the construction industry for workers to walk on sill plates while laying out or measuring the floor joists. Based on his 45-years of experience, he believed that it was a safe practice. While OSHA's six-foot rule required fall protection, the methods required were not reasonable when applied to walking on sill plates. OSHA regulations recognized that construction involved certain hazzards for which there was no complete fall protection. The use of the CAZ allowed for work to be done without the standard fall protection requirements in residential construction.

Mr. Holland explained that OSHA rules required an employee to be responsible for his actions and conduct and required the employer to furnish a working environment free from hazards likely to cause death or serious harm to the employees. In this case, RCI was the plaintiff's employer and had the obligation to provide a safe workplace. The direct employer is responsible for supplying safety equipment. There was no OSHA regulation that would require Cambridge to provide such equipment to someone it is not employing.

14

According to Mr. Holland, RCI was in direct, operative control over its employees and was responsible for defining the means and methods of performing the work, including the procedures and the safe way of doing them. Whether the measurement was done from a ladder or walking on the sill plate, it was a means or method of performing the work. There was no evidence that Cambridge had the same authority to control the means and methods. Mr. Holland opined that no action on the part of Cambridge had anything to do with the plaintiff's accident. However, he acknowledged that at his deposition he had stated that, had the steel been erected correctly, the accident could have been avoided and that Cambridge should have inspected the lot prior to allowing RCI to work on it.

At the close of the evidence, RCI moved for a directed verdict. RCI pointed out that none of the witnesses testified that RCI had done anything wrong. The trial court granted the motion. Following deliberations, the jury returned a verdict in favor of the plaintiff and against Cambridge. Following the denial of its posttrial motion, Cambridge filed a timely notice of appeal.

ANALYSIS

I.  Directed Verdict for RCI

A.  Standard of Review

"The grant or denial of a motion for [a] directed verdict is reviewed de novo." Kim v. Mercedes-Benz, U.S.A., Inc., 353 Ill.

15

App. 3d 444, 460, 818 N.E.2d 713 (2004). The Kim court recognized that there was contrary authority as to the appropriate standard of review but concluded that de novo review was appropriate "because the evidence presented at trial must be considered '"'[a]new; afresh; a second time.'"'" (Emphasis in original.) Kim, 353 Ill. App. 3d at 460, quoting Susnis v. Radfar, 317 Ill. App. 3d 817, 826, 739 N.E.2d 960 (2000), quoting City of Mattoon v. Mentzer, 282 Ill. App. 3d 628, 633, 668 N.E.2d 601 (1996), quoting Black's Law Dictionary 435 (6th ed. 1990).

"A directed verdict is appropriate where the plaintiff has failed to establish a prima facie case." Kim, 353 Ill. App. 3d at 460. "A directed verdict is granted improperly where 'there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome.'" Kim, 353 Ill. App. 3d at 460, quoting Maple v. Gustafson, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992).

### B. Discussion

In its third-party complaint, Cambridge alleged that RCI had a duty to exercise reasonable and ordinary care for the safety of the plaintiff and breached its duty to the plaintiff in the following respects:

> "(a) negligently and carelessly failed to properly
> train and supervise the Plaintiff;

16

(b) negligently and carelessly failed to warn the Plaintiff of the dangers of the job site;

(c) negligently and carelessly created an unsafe work environment by the means and methods used in its work;

(d) negligently and carelessly caused and required the Plaintiff to perform his work from the structural steel support beams of the subject building under conditions which were dangerous and unsafe;

(e) negligently and carelessly caused and required carpenters to utilize five inch wide steel beams as a temporary support while laying out floor joists;

(f) negligently and carelessly failed to provide adequate safeguards to prevent Plaintiff from injury while lawfully upon said premises;

(g) failed to make a reasonable inspection of the premises and the work being done thereon, when it knew, or in the exercise of ordinary care should have known, that said inspection was necessary to prevent injury to the Plaintiff;

(h) carelessly and negligently coordinated the work in an unsafe and improper manner; and

(i) required the Plaintiff to work in an unsafe area."

"In any negligence action, plaintiff bears the burden of proving not only a duty and breach of duty but also that the breach of that duty was the proximate cause of plaintiff's

17

injury." Taake v. WHGK, Inc., 228 Ill. App. 3d 692, 711, 592 N.E.2d 1159 (1992). "The plaintiff must present at least some evidence on every element essential to his cause of action [citations], and a directed verdict in favor of the defendant is appropriate where the plaintiff has not established a prima facie case [citation]." Saxton v. Toole, 240 Ill. App. 3d 204, 210, 608 N.E.2d 233 (1992). The above rule applies to a third-party action for contribution. See Victory Memorial Hospital Ass'n v. Schmidt, Garden & Erickson, 158 Ill. App. 3d 931, 934, 511 N.E.2d 953 (1987).

RCI maintains that Cambridge itself did not present any evidence that RCI was negligent and argues that Cambridge may not rely on the evidence introduced by the plaintiff. A similar argument was rejected in Frisch v. International Harvester Co., 33 Ill. App. 3d 507, 338 N.E.2d 90 (1975). In that case, the plaintiff sued the manufacturer and the seller of a product. The reviewing court held that the elements of strict liability had been shown by competent evidence and that it would be a waste of judicial resources to require the seller, who counterclaimed against the manufacturer, to separately prove the elements of strict liability. Frisch, 33 Ill. App. 3d at 521.

Byrne v. SCM Corp., 182 Ill. App. 3d 523, 538 N.E.2d 796 (1989) is also instructive. In that case, the plaintiffs filed a products liability case against the manufacturer of paint the husband used as part of his job. The manufacturer filed a third-

18

No. 1-05-3526

party complaint for contribution against the husband's employer. At the close of all the evidence, the trial court directed verdict for the employer on the issue of ventilation. The jury returned a verdict for the plaintiffs and against the manufacturer.

On appeal, the reviewing court upheld the granting of the directed verdict for the employer. The court noted that "defendant trial counsel was placed in an awkward position, on [t]he one side arguing the ventilation was adequate to combat plaintiffs' claims and on the other side arguing the issue of adequate ventilation should nevertheless be submitted to the jury in order to keep the contribution action in the case." Byrne, 182 Ill. App. 3d at 562-63. The court concluded that the manufacturer's problem was "not the argument, it [was] the evidence. The product was inherently dangerous. The defect was the inadequacy of the warning. Experts testified that even if the painting was done outdoors, a proper mask must be used. Therefore, although the ventilation was a condition, it was not a contributing cause." Byrne, 182 Ill. App. 3d at 563. In reaching its conclusion, the reviewing court did not appear to limit itself to the manufacturer's evidence as opposed to the evidence as a whole.

Similarly, in the present case, on one hand, Cambridge argued that walking on the sill plates was not dangerous. On the other hand, it argued that if walking on the sills was dangerous,

19

No. 1-05-3526

RCI was responsible or at least partly responsible for the plaintiff's safety. Cambridge introduced evidence establishing RCI's duty, but relied on the plaintiff's evidence to establish that RCI breached its duty to the plaintiff by allowing him to walk on the sills and that this breach resulted in the plaintiff's injury.

"[I]n ruling on a motion for a directed verdict, courts must evaluate the relative strength of the nonmovant's evidence in the context of the entire record at the time the motion is presented." Williams v. Chicago Osteopathic Health Systems, 274 Ill. App. 3d 1039, 1047, 654 N.E.2d 613 (1995). Since RCI moved for a directed verdict at the close of all the evidence, all the evidence, including that introduced by the plaintiff, must be considered. "In determining whether the court erred in directing a verdict, it is immaterial upon which side the evidence is introduced. If evidence introduced by either side, with its legitimate and natural inferences tends to establish the claim of the party opposing the motion, the motion should not be allowed." Bay Island Drainage & Levee District No. 1 v. Nussbaum, 388 Ill. 131, 134, 56 N.E.2d 615 (1944).

Viewing all the evidence in the light most favorable to Cambridge, the nonmoving party, we disagree that a verdict could never stand against RCI. The plaintiff was injured as the result of walking on a sill plate without fall protection. The responsibility for providing the fall protection was disputed at

20

trial. The plaintiff presented evidence that Cambridge was responsible for all of the safety issues. However, Cambridge presented the testimony of Mr. Holland who opined that RCI was responsible for the means and methods of performing the work on the project and for providing a safe work place for the plaintiff.

We conclude that the trial court erred in directing a verdict in favor of RCI and therefore, this case must be remanded for a new trial. We will address those issues which may arise on retrial of this case.

## II. Verdict Form

### A. Standard of Review

A trial court's determination of jury instructions will not be disturbed absent a clear abuse of discretion. Hiscott v. Peters, 324 Ill. App. 3d 114, 125, 754 N.E.2d 839 (2001). "An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc., 342 Ill. App. 3d 150, 157, 794 N.E.2d 829 (2003).

### B. Discussion

Cambridge contends that the trial court abused its discretion when it refused Cambridge's verdict form, which included Residential Steel, the steel contractor on the project. Residential Steel was never a party in this case. Nonetheless,

No. 1-05-3526

Cambridge points out that in the comment to Illinois Pattern Jury Instructions, Civil, No. B45.03A (2000) (hereinafter IPI Civil (2000) No. B45.03A, the committee recognized that the "[i]nclusion of 'nonparties' within the calculation of fault may be necessary for correct consideration of comparative fault, joint and several liability and contribution." IPI Civil (2000) No. B45.03A, Comment. However, Cambridge misinterprets the term "nonparties."

In the version applicable to this case, section 2-1117 of the Code of Civil Procedure (735 ILCS 5/2-1117 (West 1994)) provided in pertinent part that "[a]ny defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants who could have been sued by the plaintiff, shall be jointly and severally liable for all other damages." As explained by our supreme court in Unzicker v. Kraft Food Ingredients Corp., 203 Ill. 2d 64, 783 N.E.2d 1024 (2002):

>     "Section 2-1117 does not include in the division of fault
>     'anyone who could have been sued by the plaintiff.' Rather,
>     it includes 'any third-party defendant who could have been
>     sued by the plaintiff.' In other words, the party must
>     already have been brought into the case by a defendant for
>     that party to be included in the division of fault."
>     (Emphasis in original.) Unzicker, 203 Ill. 2d at 78.

22

No. 1-05-3526

Likewise, in the present case, in order for Residential Steel to be included on the verdict form, it must have been named as a party by Cambridge. Therefore, the trial court did not abuse its discretion in refusing Cambridge's jury verdict form.

### III. Video Tape

#### A. Standard of Review

"The admission of a film into evidence is within the sound discretion of the trial court [citation], and an abuse of discretion occurs only where no reasonable person would agree with the trial court's conclusion." Velarde v. Illinois Central R.R. Co., 354 Ill. App. 3d 523, 529, 820 N.E.2d 37 (2004).

#### B. Discussion

Cambridge contends that the trial court abused its discretion when it refused to admit into evidence a surveillance videotape of the plaintiff. Prior to trial, the court barred the admission of the videotape because it had been disclosed after the discovery cutoff. During the trial, Cambridge requested reconsideration of the trial court's ruling. After viewing the videotape, the trial court again denied the admission of the video tape.

"When evidence is excluded, the offer of proof is the key to preserving [the] error." Kankakee County Board of Review v. Property Tax Appeal Board, 316 Ill. App. 3d 148, 155, 735 N.E.2d 1011 (2000). "The purpose of the offer of proof is to disclose the nature of the evidence offered to the trial judge and

23

opposing counsel and to the reviewing court in order that it may determine whether the exclusion of evidence was erroneous." Kankakee County Board of Review, 316 Ill. App. 3d at 155.

The plaintiff maintains that in order to be sufficient, the offer of proof in this case should have included the videotape. Compare Kankakee County Board of Review, 316 Ill. App. 3d at 153 (if the offer of proof pertains to a document, the party should be allowed to place the document into the record); People v. Phillips, 186 Ill. App. 3d 668, 679, 542 N.E.2d 814 (1989) (where the document was not made part of the record on appeal, counsel's statement about the content of the document was insufficient to show that the defendant was prejudiced by the court's refusal to allow cross-examination of a witness based on the document). The plaintiff concludes that in the absence of the videotape, Cambridge has waived any error with regard to its admissibility. See Schmitz v. Binette, 368 Ill. App. 3d 447, 453, 857 N.E.2d 846 (2006) (failure to make offer of proof will waive a claim that evidence was improperly excluded).

"'[A]n offer of proof is not required if it is apparent that the trial judge understood the nature of the objection and the character of the evidence sought to be introduced or if the questions themselves and the circumstances surrounding them show the purpose and materiality of the evidence.'" Schmitz, 368 Ill. App. 3d at 454, quoting Carter v. Azaran, 332 Ill. App. 3d 948, 956, 774 N.E.2d 400 (2002), citing Bafia v. City International

No. 1-05-3526

Trucks, Inc., 258 Ill. App. 3d 4, 7-8, 629 N.E.2d 666 (1994).  An offer of proof is sufficiently specific "if it adequately shows the court what the evidence would be, allowing a court of review to assess the prejudice allegedly inuring from the exclusion." People v. Wallace, 331 Ill. App. 3d 822, 831, 772 N.E.2d 785 (2002).

In the present case, the offer of proof consisted of Cambridge's counsel's statement as to the identities of the videographers, the type of equipment they used and their work experience in recording and editing videotapes.  Counsel further stated that if called as witnesses, the two videographers would have testified that the videotape was a recording of the plaintiff and his activities on February 10, 2005, and that the videotape accurately portrayed their observations of the plaintiff's activities on that date.[3]

In this case, since the trial court actually viewed the videotape, the court was made aware of what the evidence would be.  However, "'[t]he offer serves no purpose if it does not demonstrate, both to the [circuit] court and to reviewing courts, the admissibility of the testimony which was foreclosed by the sustained objection.'"  Kim, 353 Ill. App. 3d at 451, quoting People v. Andrews, 146 Ill. 2d 413, 421, 588 N.E.2d 1126 (1992).

---

[3]The record does contain a surveillance report describing the videographers' observations of the plaintiff's activities, but that was not included in offer of proof.

25

No. 1-05-3526

Since the videotape is not available to this court and the offer of proof does not describe what activities the plaintiff was engaged in and under what circumstances these activities were undertaken, we are unable to determine whether its exclusion was proper.

A new trial should be ordered "'only when evidence improperly admitted appears to have affected the outcome of the trial.'" Schmidt v. Ameritech Illinois, 329 Ill. App. 3d 1020, 1040-41, 768 N.E.2d 303 (2002), quoting Tzystuck v. Chicago Transit Authority, 124 Ill. 2d 226, 243, 529 N.E.2d 525 (1988). "In other words, a new trial is necessary where the exclusion of evidence was the result of 'serious and prejudicial errors made at trial.'" Schmidt, 329 Ill. App. 3d at 1041, quoting Lagestee v. Days Inn Management Co., 303 Ill. App. 3d 935, 942, 709 N.E.2d 270 (1999).

According to the videographers' surveillance report in the record, the plaintiff was observed doing carpentry work for another employer. However, the plaintiff testified he was able to do carpentry work, even though he was slower now, and hammering, for example, caused him pain. Moreover, Cambridge candidly concedes that it cannot prove the videotape would have altered the outcome of the trial. Therefore, even if the exclusion of the videotape was an abuse of discretion, the exclusion of the videotape would not have required that Cambridge receive a new trial.

26

### IV.  Absence of OSHA Violations

#### A.  Standard of Review

"An abuse of discretion standard applies when this court reviews a trial court's evidentiary rulings."  Chapman v. Hubbard Woods Motors, Inc., 351 Ill. App. 3d 99, 105, 812 N.E.2d 389 (2004).

#### B.  Discussion

Cambridge agreed with the trial court's ruling barring any evidence of OSHA violations.  However, Cambridge contends that the trial court abused its discretion when it barred any evidence that OSHA had never issued citations for walking on sill plates.  Cambridge maintains that such evidence supported Cambridge's argument that its conduct was reasonable.

A party may introduce evidence of a lack of prior accidents or incidents when that party establishes a proper foundation.  McKenzie v. SK Hand Tool Corp., 272 Ill. App. 3d 1, 11, 650 N.E.2d 612 (1995).  A proper foundation would require evidence "establishing that such absence took place under conditions substantially similar to those surrounding the accident sued upon."  Parson v. City of Chicago, 117 Ill. App. 3d 383, 388, 453 N.E.2d 770 (1983).  In Parson, the court recognized that "'evidence of absence of accidents has less probative value than evidence of previous accidents, and thus is more easily outweighed by the factor that the collateral issue will result in jury confusion *** Evidence of absence of accidents usually

27

involves generally unreliable negative evidence *** and does not tend directly to prove absence of negligence.'" Parson, 117 Ill. App. 3d at 388-89, quoting Grubaugh v. City of St. Johns, 82 Mich. App. 282, 288, 289, 266 N.W.2d 791 (1978).

Cambridge argues that the testimony of Mr. Colleran and Mr. Holland laid a sufficient foundation for the admission of the evidence that OSHA had not issued violations for allowing a worker to walk on a sill plate. However, Mr. Colleran's testimony was that he was unaware that OSHA had ever issued a violation in such circumstances. Mr. Holland's testimony that OSHA had never cited anyone for walking on a sill plate was limited to his own knowledge. This testimony failed to establish that, under the conditions substantially similar to those surrounding the plaintiff's accident, OSHA would not have issued a citation. Therefore, the trial court did not abuse its discretion in barring evidence as to the lack of OSHA citations.

## V. Non-IPI Instructions

### A. Standard of Review

We review a trial court's determination whether or not to provide a particular jury instruction under the abuse of discretion standard. Webber v. Wight & Co., 368 Ill. App. 3d 1007, 1020, 858 N.E.2d 579 (2006). A reviewing court will not disturb the trial court's determination absent a clear abuse of discretion. Webber, 368 Ill. App. 3d at 1020.

28

No. 1-05-3526

## B. Discussion

At trial, Cambridge maintained that the IPI instructions pertaining to construction negligence set forth an inaccurate statement of the law and tendered non-IPI instructions on that issue. The plaintiff objected, and the trial court gave the jury the IPI construction negligence instructions. Accordingly, the jury was instructed as follows:

"A contractor who entrusts work to a subcontractor can be liable for injuries resulting from the work if the contractor retained some control over the safety of the work and the injuries were proximately caused by the contractor's failure to exercise that control with ordinary care." IPI Civil (2005) No. 55.01.

Cambridge's proposed instruction read as follows:

"A contractor who entrusts work to a subcontractor can be liable for injuries resulting from the work if the contractor retained some control over the means and methods or operative detail of the subcontractor's work and the injuries were proximately caused by the contractor's failure to exercise that control with ordinary care."

The jury was also given IPI Civil (2005) No. 55.02 as follows:

"A party who retained some control over the safety of the work has a duty to exercise that control with ordinary care."

Cambridge's proposed instruction read as follows:

29

"A party who retained some control over the means and methods or operative detail of the subcontractor's work has a duty to exercise that control with ordinary care."

The jury was also given IPI Civil (2005) No. 55.03, which is in pertinent part as follows:

"Plaintiff, Andrew Jones, seeks to recover damages from defendant Cambridge Homes, Inc. In order to recover damages, the plaintiff has the burden of proving:

1. The defendant retained some control over the safety of the work."

Cambridge's proposed instruction read in pertinent part as follows:

"Plaintiff, Andrew Jones seeks to recover damages from defendant DRH Cambridge Homes, Inc. The Plaintiff claims and in order to recover damages, the plaintiff has the burden of proving:

1. The defendant, DRH Cambridge Homes, Inc., retained some control over the means and methods or operative detail of the work."

Finally, the jury was given IPI Civil (2005) No. 55.04 as follows:

"One or more persons may have some control over the safety of the work. Which person or persons had some control over the work under the particular facts of this case is for you to decide."

30

No. 1-05-3526

"[T]he trial court has the discretion to determine if a particular jury instruction is applicable, supported by evidence in the record, and an accurate statement of the law." Luye v. Schopper, 348 Ill. App. 3d 767, 773, 809 N.E.2d 156 (2004). "Once a trial court determines an instruction is to be given, then Supreme Court Rule 239(a) (177 Ill. 2d R. 239(a)) creates a presumption that the Illinois Pattern Instructions (IPI) are to be used." Luye, 348 Ill. App. 3d at 773. Whether an instruction is an accurate statement of the law is reviewed de novo. Luye, 348 Ill. App. 3d at 773.

In its introduction to the construction negligence series of the IPI instructions, the committee reviewed a number of cases on the issue of control of the work and concluded as follows:

"Due to the lack of consensus among the appellate courts and no Supreme Court cases on this subject since [Larson v. Commonwealth Edison Co., 33 Ill. 2d 316, 211 N.E.2d 247 (1965)], the concept of 'control' caused the committee great difficulty. The committee chose to concentrate on the area of 'safety' in these instructions. The committee believed that the overriding consideration throughout all of these cases is the ability of the controlling entity to affect overall job safety. It would appear that the ability to stop unsafe work and not permit it to be resumed until done to the satisfaction of the controlling entity satisfies both the requirement of

31

No. 1-05-3526

'control' and demonstrates that the contractor is 'not entirely free to do the work in his own way.'" IPI Civil (2005) No. 55.00, Committee Comment b.

The committee further observed that the Larson court chose not to define "'having charge of the work,'" stating it was a "'generic term of broad import.' [Citation.]  Whether the term 'control' will be treated similarly will depend on further judicial interpretation to help guide the committee."  IPI Civil (2005) No. 55.00, Committee Comment b.

"The Illinois Supreme Court has held that pattern instructions are not exempt from challenge."  Luye, 348 Ill. App. 3d at 776.  "Pattern instructions do not receive advance approval by the Illinois Supreme Court and are only approved or rejected through judicial questioning and consideration."  Luye, 348 Ill. App. 3d at 776.

Cambridge's argument that the IPI instructions on construction negligence do not accurately state the law is based on this court's decision in Martens v. MCL Construction Corp., 347 Ill. App. 3d 303, 807 N.E.2d 480 (2004).  In that case, we upheld a summary judgment in favor of the general contractor finding that the plaintiff had failed to raise a question of fact as to whether the general contractor had retained control or exercised supervisory or operational control over the subcontractor to be held liable.  Martens, 347 Ill. App. 3d at 315.

32

In Martens, the plaintiff, relying on the analysis in Moss v. Rowe Construction Co., 344 Ill. App. 3d 772, 801 N.E.2d 612 (2003), asserted that the central issue was the general contractor's ability to affect worker safety. Martens, 347 Ill. App. 3d at 318; see Moss, 344 Ill. App. 3d at 777 ("The issue is not control of the 'means and methods' of performing the task, but rather who contractually and/or physically has the duty to control safety of the project"). We disagreed with Moss stating as follows:

"The central issue is retained control of the independent contractor's work, whether contractual, supervisory, operational, or some mix thereof. The party who retains control is the logical party upon whom to impose the duty to ensure worker safety." Martens, 347 Ill. App. 3d at 318.

See also Doe v. Big Brothers Big Sisters of America, 359 Ill. App. 3d 684, 695-96, 834 N.E.2d 913 (2005) (reiterating that Martens rejected Moss's view that the right to control safety alone sufficient to subject a general contractor to liability).

Cambridge maintains that the decision in Martens means that the construction negligence IPI instructions no longer reflect the common law on construction negligence. Therefore, its proposed jury instructions, which incorporated the holding from Martens, should have been given to the jury. We disagree, noting that the Martens court referred to IPI Civil (2005) No. 55.02 without criticism, stating as follows:

33

"Penalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety. A party who retains some control over the safety of the work has a duty to exercise that control with ordinary care. [IPI Civil (supp. 2003) No. 55.02]. Nevertheless, the existence of a safety program, safety manual or safety director does not constitute retained control per se; the court must still conduct an analysis pursuant to the section 414 retained control exception. [Citation.] We recognize, of course, that if a defendant's safety program sufficiently affected a contractor's means and methods of doing its work, then such program could bring the defendant within the ambit of the retained control exception. [Citation.]" Martens, 347 Ill. App. 3d at 318-19.

In Martens, the general contractor could make safety recommendations but could not demand that the subcontractor's employees comply with a safety standard that exceeded the OSHA requirement. In contrast, Cambridge could require compliance with its safety standards and stop the work if RCI's employees were violating its safety rules. We note that "our courts take a dim view of 'culling passages from opinions and incorporating them into instructions. Costa v. Dresser Industries, Inc., 268 Ill. App. 3d 1, 12, 642 N.E.2d 898 (1994), quoting People v. Bush, 157

34

No. 1-05-3526

Ill. 2d 248, 256, 623 N.E.2d 1361 (1993). Moreover, the <u>Martens</u> court's cite to the pattern instructions on construction negligence does not suggest that the court intended its decision to mean that the pattern instruction no longer reflected an accurate statement of the law.

We conclude that the trial court did not abuse its discretion in refusing Cambridge's non-IPI instructions.

### VI.   Special Interrogatory

#### A.   <u>Standard of Review</u>

A trial court's denial of a request for a special interrogatory presents a question of law and is reviewed <u>de</u> <u>novo</u>. <u>Hooper v. County of Cook</u>, 366 Ill. App. 3d 1, 6, 851 N.E.2d 663 (2006); 735 ILCS 5/2-1108 (West 2004).

#### B.   <u>Discussion</u>

The giving of special interrogatories is governed by section 2-1108 of the Code of Civil Procedure, which provides in pertinent part as follows:

"Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. ***  When the special finding of fact is inconsistent with

35

the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2004).

A trial court has no discretion but to submit to the jury a special interrogatory, requested by a party, as long as it is in the proper form. Northern Trust Co. v. University of Chicago Hospitals & Clinics, 355 Ill. App. 3d 230, 251, 821 N.E.2d 757 (2004). "A special interrogatory is in [the] proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." Northern Trust Co., 355 Ill. App. 3d at 251. "The required inconsistency arises when the special interrogatory is '"clearly and absolutely irreconcilable with the general verdict."'" Northern Trust Co., 355 Ill. App. 3d at 251, quoting Simmons v. Garces, 198 Ill. 2d 541, 556, 612 N.E.2d 85 (2002), quoting Powell v. State Farm Fire & Casualty Co., 243 Ill. App. 3d 577, 581, 612 N.E.2d 85 (1993). "If a special interrogatory does not cover the issues upon which the jury is called to render a decision and a '"reasonable hypothesis"' is left unaddressed that would allow the special interrogatory to be construed consistently with the general verdict, the special interrogatory is not 'absolutely irreconcilable' with the general verdict, is improper in form, and thus, may not be submitted to the jury." Northern Trust Co., 355 Ill. App. 3d at 251, citing Simmons, 198

36

No. 1-05-3526

Ill. 2d at 556, citing Powell, 243 Ill. App. 3d at 581. Finally, a special interrogatory that is repetitive, misleading, confusing, or ambiguous is not in proper form. Blakey v. Gilbane Building Corp., 303 Ill. App. 3d 872, 882, 708 N.E.2d 1187 (1999).

Cambridge tendered the following special interrogatory:

"Did DRH Cambridge Homes, Inc. retain control over the means and methods or the operative detail of Residential Carpentry, Inc. and/or the plaintiff?"

In determining whether a special interrogatory meets the criteria of being in the proper form, the court should consider the language of the special interrogatory within the context of all of the jury instructions. Johnson v. Owens-Corning Fiberglas Corp., 313 Ill. App. 3d 230, 236, 729 N.E.2d 883 (2000). In this case, the instructions to the jury referred to control over safety while the special interrogatory referred only to control over the work. We agree with the plaintiff that the special interrogatory was confusing and ambiguous when considered in connection with the other instructions given to the jury.

More significantly, even if it had answered Cambridge's special interrogatory negatively, the jury still could have concluded that Cambridge, by virtue of its ability to stop the work if RCI violated Cambridge's safety rules, retained control of the safety issues, rendering it liable to the plaintiff. Therefore, the special interrogatory was not absolutely

37

irreconcilable with the general verdict. Therefore, the trial court was correct in refusing to submit the special interrogatory to the jury.

Following the issuance of the original disposition in this case, the plaintiff filed a petition for rehearing requesting that this court affirm the damages award in this case and limit the retrial of this case to the issue of liability. The plaintiff argued that the retrial in this case should be limited to liability only since Cambridge did not raise any issue as to damages in its appeal.

Pursuant to Supreme Court Rule 367(d) (210 Ill. 2d R. 367(d)), this court ordered RCI and Cambridge to answer the petition for rehearing. In their responses, both Cambridge and RCI argued that because the trial court granted RCI's motion for a directed verdict, RCI never had the opportunity to offer jury instructions and to argue the question of damages to the jury. The plaintiff argues that RCI never challenged the damages evidence at trial.

This court has held that "[a]n appellate court should limit the issues to be resolved on retrial only where it is plain that any error that has crept into one element of the verdict did not affect the determination of any other issue." Phillips v. Gannotti, 327 Ill. App. 3d 512, 521, 763 N.E.2d 820 (2002). "A limited retrial should not be granted if it might be prejudicial to either party." Phillips, 327 Ill. App. 3d at 521; see

38

Glassman v. St. Joseph Hospital, 259 Ill. App. 3d 730, 769, 631 N.E.2d 1186 (1994) (a retrial limited to damages is appropriate only if the questions of liability and damages are so separate and distinct that a retrial only as to damages is not unfair).

In Ready v. United/Goedecke Services, Inc., 367 Ill. App. 3d 272, 854 N.E.2d 758 (2006), appeal allowed, 222 Ill. 2d 600, 861 N.E,2d 664 (2006), this court limited the retrial of the case to the issue of liability where the defendant-appellant failed to raise an issue on appeal as to the amount of damages awarded. Likewise, in the present case, Cambridge never argued on appeal that the damages were excessive. However, unlike Ready, this case involves another defendant, RCI, which was an appellee in this appeal.

After considering the parties' arguments and the authorities cited in support thereof, we conclude that the effect of the reversal of the directed verdict in its favor and a remand for a new trial, if limited to liability, would be to deny RCI its right to argue the damages issue. Therefore, in the interests of fairness and a just result, we direct that the retrial of this case include both liability and damages issues.

The directed verdict in favor of RCI is reversed. The cause is remanded for a new trial on both liability and damages, consistent with the views expressed in this opinion.

Reversed and remanded with directions.

SOUTH and KARNEZIS, JJ., concur.